UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
In re                                    :
                                         :          Chapter 11
KOLLEL MATEH EFRAIM, LLC, a/k/a          :          Case No. 04-16410 (SMB)
MATEH EPHRAIM LLC, a/k/a                 :
KOLEL MATEH EFRAIM,                      :
                                         :
                        Debtor.          :
------------------------------------------------------x

## POST-TRIAL FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

**A P P E A R A N C E S :**

BACKENROTH FRANKEL & KRINSKY, LLP
Attorneys for the Debtor
489 Fifth Avenue
New York, New York 10017

      Abraham Backenroth, Esq.
      Scott Krinsky, Esq.
         Of Counsel

LAW OFFICES OF DAVID CARLEBACH
Attorneys for Helen-May Holdings, LLC
40 Exchange Place
New York, New York 10005

      David Carlebach, Esq.
         Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge:**

      The debtor, Kollel Mateh Efraim, LLC, moved to enforce a settlement made on the

record between the attorneys for the debtor and Helen-May Holdings, LLC ("Helen-May")

during a July 20, 2005 hearing.  Helen-May subsequently denied that its attorney, Gerald Orseck,

Esq., had the authority to agree to the settlement, and the issue has been hotly contested by the

parties.  The Court conducted a three-day bench trial, and now concludes that Orseck lacked the

authority to enter into the settlement.  Accordingly, the debtor's motion to enforce the settlement is denied.

## BACKGROUND[1]

The events leading up to the trial are set forth in the Court's <u>Opinion and Order Denying Motion for Summary Judgment</u>, dated Dec. 15, 2005 (the "<u>Opinion</u>").  (ECF Doc. # 55.)  The dispute involves a contract to sell property (the "Property") located in Fosterdale, New York for the sum of $1.4 million.  The original contract vendee assigned the contract to the debtor. Helen-May owns the Property.  Irene Griffin ("Irene") is the principal and managing member of Helen-May (Tr. (7/19), at 9.)  Her husband, Paul Griffin ('Paul') manages Helen-May,  (<u>id.</u>, at 9), and the trial confirmed that he is the primary decision maker.

As a result of the disputes described in the Opinion, the debtor filed this chapter 11 case on October 4, 2004.  It is unnecessary to recount the parties' disputes because this proceeding solely concerned Orseck's authority to settle them.  Accordingly, this decision is limited to the consideration of Orseck's authority.

## A.    Settlement Discussions Prior to July 20, 2005

David Carlebach, Esq., initially represented Helen-May, but in May 2005, Orseck replaced him.  Both prior to and after Orseck's substitution, Helen-May and the debtor discussed the possibility of a settlement.  Despite some bluster that Helen-May was not interested in a

---

[1]    The following conventions are used in citing to the trial record.  The daily transcript is cited by date and page.  For example, "Tr. (7/19), at 10" refers to page 10 of the July 19, 2006 transcript.  "DX" refers to the debtor's trial exhibits and "HMX" refers to Helen-May's trial exhibits.

settlement, (see HMHX 2), Orseck spoke about settling the case during late May and early June

with Scott Krinsky, Esq., a partner in Backenroth, Frankel & Krinsky, LLP, the debtor's

attorneys.   (Tr. (7/24), at 168; Tr. (7/27), at 8, 11.)  Orseck made Paul aware of these

discussions.  (Tr. (7/27), at 11-12.)

Orseck and Paul also discussed settlement parameters during the latter part of May.  (Id.

at 9.)  On May 25, 2005, and in response to these ongoing discussions, Paul faxed a one-page

memo to Orseck regarding "Discussions For Settlement," which was accompanied by a fax

cover sheet bearing the "subject" "Considerations For Settlement."  (DX 2.)  The memo was

intended to guide Orseck's discussions.  (See Tr. (7/19), at 93.)  Although the unpaid balance on

the contract stood at $1,260,000, the memo implied that Helen-May required $3,009,400 from

the debtor to be made whole.

Paul's view of a fair settlement differed markedly from the debtor's.  Thus, when in late

May or early June the debtor offered to pay Helen-May the contract price, less the $140,000

deposit, the offer infuriated the Griffins.[2]  (Tr. (7/27), at 16, 25.)  Orseck shot back a letter to

Krinsky, dated June 3, 2005, in which he relayed his "unequivocal marching orders" that the

Griffins "will do no business with your clients of any kind, nature or description."  (HMHX 3.)

Consistent with the June 3rd letter, Orseck began taking a harder line with the debtor.

(Tr. (7/27), at 17.)  On or about the same day, he filed a motion for summary judgment in the

adversary proceeding, (id. at 16), and on June 12, Orseck filed a motion to convert the chapter 11

case to chapter 7.  (Id. at 17.)  The motion included an alternative request for relief from the

---

[2]         A week or two later, the debtor increased its offer to pay $100,000 over the contract price.  Orseck did not
relay that offer to the Griffins because of their reaction to the prior offer.  (Tr. (7/27), at 25.)

automatic stay.  (Opinion at 3.)  The debtor countered with a disclosure statement and a plan that

contemplated the assumption of the sale contract.

### 1.    The June 28th Hearing

The lawyers appeared for a hearing on the various motions on June 28, 2005.  The

Griffins also attended.  At the hearing, the Court deemed the conversion motion to include a

request to dismiss the case and the motion for relief from the automatic stay to include a demand

for adequate protection.  (Id. at 3-4.)  After reserving decision on the motion for summary

judgment made in the adversary proceeding, the Court adjourned the motion to dismiss or

convert, and the motion for stay relief or adequate protection, to July 20th, and scheduled an

evidentiary hearing for that day.  (Id. at 4.)  In addition, the Court scheduled a hearing on the

debtor's motion to approve its disclosure statement for the same day.  (Id.)  The Griffins were

present when the adjournments were announced.

The Griffins were dissatisfied with the results of the June 28th hearing, (Tr. (7/27), at 19),

and were disappointed with Orseck's performance.  (Tr. (7/19), at 199.)  They were experiencing

significant personal financial problems, and had recently refinanced the mortgage on the

Property at a high interest rate.  (Tr. (7/27), at 19-21.)  Hence, delay increased the financial

pressure.  In addition, the debtor's proposed plan involved an assumption of the sale contract,

which meant that the debtor might ultimately be able to purchase the Property by paying the

balance of the contract price and curing any defaults.  Orseck testified that the proposed plan

bothered the Griffins the most.  (Id. at 22.)

According to Orseck, these factors "softened" the Griffins' willingness to settle.

Although they had always preferred to oust the debtor and get the Property back, the Griffins

4

told Orseck that they were willing to accept a payment from the debtor in lieu of the return of the

Property.  (Id. at 23.)  Dan Scher, Esq., the Griffins' business lawyer and trusted advisor,

confirmed that during the week preceding the July 20th hearing, he and Orseck had many

discussions regarding the parameters of possible settlement with the debtor, and a "principal of

Helen-May Holdings, LLC" participated on a few of those occasion.  (Tr. (7/24), at 123.)

Additionally, these discussions involved scenarios under which Helen-May would transfer the

Property to the debtor.  (Id. at 124.)

### 2.    The Events of July 18th and July 19th

On July 18, 2005, Paul sent Orseck another set of instructions regarding settlement

parameters.  (DX 9.)  Paul estimated that the Property was worth close to $3 million.  In

addition, Helen-May had suffered damages in the sum of $1.25 million due to the debtor's fraud.

 Hence, Paul stated, "[i]t makes no sense for us to settle for anything less than $4,150,000.00."

In addition, the debtor's principal, Jack Lefkowitz, or his assignee should be responsible for any

real estate commissions and transfer taxes.  Finally, Paul suggested that Jack Lefkowitz's

fraudulent activities would be a matter of interest to the SEC, the Department of Justice and the

Attorney General.

Paul's memo increased Orseck's growing exasperation with his client.  He viewed the

Griffins as naïve, and their demands as unrealistic.  (Tr. (7/27), at 26-27.)  He described Paul's

instructions as "bizarre," and implied that he had to pick and choose which ones to follow and

which to ignore.  (Id. at 126.)  During this period, he enlisted Scher's help to convince the

Griffins to be more reasonable.  (See id. at 26-27; (Tr. 7/24), at 67.)  Orseck thought that a

reasonable settlement fell between $300,000 and $400,000 above the contract price, and testified

that Scher agreed with his analysis.  (Tr. (7/27), at 36.)

Orseck met with the Griffins on July 19th.  The previous day, he had received another proposal from Krinsky increasing the debtor's offer to $200,000 above the contract price.  (DX 7.)  At the meeting with the Griffins, Orseck relayed the increased offer.  (Tr. (7/19), at 86-87, 200.)  The Griffins directed Orseck to reject it, (Tr. (7/27), at 35), and Orseck wrote to Krinsky the same day, stating, "[t]he case is not settled.  There is a problem with Griffin."  (DX 8.)

According to Orseck, he nonetheless believed that he was authorized to settle the case at between $300,000 and $400,000 above the contract price balance, based on the following scant evidence: Orseck explained to the Griffins at the meeting that the other side would not settle for more than it could lose in litigation; the Griffins said they understood.  Orseck also explained that the most they could get was $400,000 above the contract price; the Griffins again said they understood, and asked how soon they could get the money.  Finally, the Griffins were concerned that the debtor had not yet escrowed the purchase price, and wanted assurances that they would be paid.  (Tr. (7/27), at 118-19.)  Orseck conceded, however, that the Griffins never expressly agreed to any settlement, or authorized Orseck to settle in the $300,000 to $400,000 range.  (Id. at 127)("The Griffins did not say you are hereby authorized to settle the case for three or $400,000.")

Also on July 19th, apparently after his meeting with the Griffins, the debtor's attorney (Mark Frankel, Esq.) contacted Orseck to obtain his consent to an adjournment.[3]  (Id. at 39.)  Orseck had no objection, assumed that the matter would be adjourned, and scheduled another

---

[3]        I assume this occurred after the meeting with the Griffins because it did not come up during that meeting.

matter in Brooklyn for the morning of July 20th. (Id. at 40.) In addition, he asked his secretary to call the Griffins to tell them that the matters were going to be adjourned. (Id. at 40.) As a result, they did not attend the critical hearing the next day. (Tr. (7/19), at 28.)

### 3.    The July 20th Hearing and the Settlement on the Record

Orseck came to the Court the next morning, expecting the matter to be adjourned. Frankel, however, had shown up with several witnesses. (Tr. (7/27), at 40.) Frankel told Orseck that the Court would not adjourn a trial that it had scheduled, and that was the first that Orseck knew that the matter was going forward. (Id.)

Owing to "happenstance," Orseck came to court with a witness, Gene Barbanti. (Id. at 107.) Barbanti was a real estate broker, consultant and appraiser, (see Tr. (7/19), at 38; HMHX 17 ("July 20 Tr."), at 5-8), who was involved in the Brooklyn matter with Orseck.[4] (Tr. (7/27), at 107.) He was also the individual that had performed certain valuation work for Helen-May, and was prepared to testify regarding the fair rental value of the Property.

Prior to the beginning of the hearing, the Court conducted a settlement conference in chambers at the request of counsel. (See Tr. (7/24), at 180.) During the conference, Orseck indicated that he had the authority to settle the case for $325,000 above the contract price. (Tr. (7/27), at 42.) Despite Orseck's belief in his authority, stemming from the meeting with the Griffins on the previous day, he needed reassurance, and called Paul at 10:43 a.m. (Tr. (7/19), at 28; see HMHX 18.)

---

[4]    The record does not reflect whether Orseck and Barbanti traveled together from upstate New York to attend the Brooklyn hearing.

7

He did not get that reassurance by everyone's account.  According to Paul, Orseck said he had spoken to Scher, and the most that Helen-May could expect was between $300,000 and $400,000 above the contract price.  Paul said no, and directed Orseck to get the Property back.  At that point, Orseck hung up and/or the line went dead.  (Tr. (7/19), at 30.)

Orseck's version differed in one respect.  He told the Griffins that he had spoken to Scher, and Scher was prepared to recommend a settlement between $300,000 and $400,000 above the contract price.  (Tr. (7/27), at 38.)  The call was cut off before the Griffins could accept or reject the proposal.  (See id. at 39.)  Nevertheless, Orseck admitted that he never received a confirmation from the Griffins, and that he did not have specific settlement authority from the Griffins.  Rather, he was under the impression, based on his conversations with the Griffins on July 19th, that "they would agree to settle the case for that amount."  (Id. at 71-76.)  Yet despite his need for reassurance of his authority, Orseck did not call back.

Paul did.  (Tr. (7/19), at 30-31.)  Believing that Orseck was in his office, Paul called him there.  Someone on Orseck's staff told Paul that Orseck was not in, and his whereabouts were not known.  (Id. at 31.)  Paul then tried unsuccessfully to reach Orseck on his cell and home phones.  (Id.)  Orseck didn't answer because, unbeknownst to Paul, he was in court at the time.[5]

The parties could not reach a settlement agreement during the chambers conference, and the hearing began.  Based on Barbanti's testimony, (see July 20 Tr., at 5-10), the Court fixed the fair rental value of the Property at $140,000 annually plus the real estate taxes, and directed the debtor to pay that sum prospectively on a monthly basis.  (Id. at 13, 41-42.)  The Court also took

---

[5]        The Court does not allow attorneys to bring cell phones into the courthouse.

evidence on the amount of the debtor's cure obligation, and fixed that amount at $1,500 per day

after November 29, 2004, less the monthly "U & O" paid by the debtor, subject, however, to a

possible defense that an earlier order issued by Judge Blackshear's limited adequate protection to

$5,000 per month.  (Id. at 53.)  The total amount that the debtor would have to pay for the

Property in order to assume the sale contract remained unresolved, because the parties disputed

whether the debtor had actually made or stopped certain payments.  (See id. at 42-44.)

Several legal issues also had to be resolved prior to confirmation.  These included

whether the debtor could assume the contract in light of a clause stating that "time is of the

essence," and whether the debtor's proposed treatment impaired Helen-May, entitling it to vote.[6]

 (Id. at 46-49.)  In addition, and as already stated, the debtor argued that Judge Blackshear's

order placed a $5,000 monthly cap on the amount of adequate protection that Helen-May could

recover, and precluded Helen-May from recovering the $1,500 per day ordered by the Court.

(See id. at 37-38.)  Frankel requested an adjournment to another date to deal with these issues.

(Id. at 47-48.)  The parties and the Court then discussed the appointment of a mediator, the

disposition of Helen-May's other motions and the memorialization of the Court's rulings.

Up to this point, there had been no break since the hearing began.  I had to get to a

meeting, asked whether there was anything else, and received a surprising answer: Orseck and

Frankel told me they might have a settlement.  (Id. at 55.)  Following the luncheon recess,

counsel returned to place their agreement on the record.  They agreed to settle for a purchase

price of $1,725,000, less the $140,000 down payment, and plus or minus a few other closing

---

[6]        The impairment issue was especially important.  The debtor conceded that if Helen-May was entitled to
vote and rejected the plan, it could not be confirmed.  (See July 20 Tr., at 49.)

adjustments.[7]  (Id. at 57-58.)  At several points, I advised counsel, and Orseck acknowledged, that the settlement was binding without regard to any further memorialization:

| | |
|---|---|
| THE COURT: | This is a settlement on the record. |
| MR. ORSECK: | Yes. |
| THE COURT: | This is binding. |
| MR. ORSECK: | Yes, of course. . . . |

(Id. at 57.)

After the parties explained how the tax adjustment worked, they confirmed their agreement to the settlement:

| | |
|---|---|
| THE COURT: | Right. Is that -- |
| MR. FRANKEL: | Yes. |
| THE COURT: | -- agreeable to the debtor and is that agreeable to the seller? |
| MR. ORSECK: | Yes. |
| THE COURT: | Okay.  The matter is deemed settled. . . . |

(Id. at 58.)

The Court and counsel then explored the timing and procedure for approving the settlement. Orseck was very anxious to consummate the deal as quickly as possible.  I suggested that the parties settle a stipulation on ten days notice that provided for the assumption of the contract on the terms set forth on the record.  (Id. at 59-60.)  Orseck stated that he did not need ten days, and asked to shorten the time because his client was paying a premium mortgage interest rate.  (Id. at 60.) Frankel speculated that he might be able to obtain the consent of all of the creditors, implying that

---

[7]        There was no evidence or suggestion that Orseck called Paul during the lunch recess to discuss the settlement or confirm Helen-May's willingness to accept it.

approval could be obtained sooner than ten days.  (Id.)  I advised the parties to try to agree on a

stipulation within the next two days, but repeated once again that "I consider it settled under these

terms and what we're really talking about is the mechanics now."  (Id. at 61.)

## B.    The Aftermath

Paul continued to send Orseck settlement memos, and coincidentally, sent one at

approximately 3:40 p.m. on July 20, 2005.   According to Paul, the "settlement figure" was now

$2,810,000.  (DX 11, 12.)  Paul first heard about an actual settlement at approximately 5:00 p.m.

when he Paul spoke to Kirk Orseck ("Kirk"), Orseck's son and law partner, who congratulated

him on the settlement.  (Tr. (7/19), at 34.)  Paul sent an e-mail to Orseck at 6:25 p.m., expressing

his concern about Kirk's reference to a settlement, and stating that the Griffins, as always,

wanted the stay lifted and the Property returned.  He also wanted to know the next scheduled

court date.  (DX 11.)  He sent a copy of this e-mail to Scher about one hour later.  (DX 14.)

Sometime during the evening of July 20, 2005, the Griffins spoke to Scher.  They advised

him that during their morning phone conference with Orseck, Orseck had said that Scher

indicated that the Griffins should accept between $300,000 and $400,000 above the contract

price balance.   (Tr. (7/19), at 204); Tr. (7/24), at 49.)  Scher told Paul that he never had such a

conversation with Orseck.  (Tr. (7/19), at 204.)

On July 22nd, the Griffins met with Orseck for about 15 minutes in his office.  (Id. at 41.)

 According to Paul, Orseck advised the Griffins that the Court had made some "favorable

rulings," but did not indicate what actually happened. (Id. at 42-43.)  Orseck did not say anything

that led the Griffins to believe that there had been a Court hearing on July 20th, or that the case

had been settled.  (Id. at 43-44.)  Paul conceded that the Griffins "weren't listening real

11

carefully" when Orseck spoke.  (Id. at 42.)  Remarkably, the Griffins did not question Orseck

about the supposed settlement mentioned by Kirk, or discuss Paul's own July 20th e-mail to

Orseck regarding what Kirk had said.  (See Tr. (7/24), at 17; Tr. (7/19) at 102.)

Orseck gave a different account of the meeting.  He testified that he advised the Griffins

that he had settled the case in Court on July 20, 2005, for $325,000 above the contract price

balance.  (Tr. (7/27), at 44-45.)  He also told the Griffins that the Court had rendered favorable

rulings at the hearing on July 20, 2005, and these rulings induced the settlement.  (Id. at 44, 89.)

Following his conversation with Orseck, Paul generated yet another settlement document

entitled "Settlement Offer – July 22, 2005."  (DX 15; see Tr. (7/19), at 103.)  The "Settlement

Offer" resembled a loan closing statement.  It included a computation of the "closing costs," and

set forth how the sale proceeds would be distributed at a closing.  The "Settlement Offer" also

included a listing of unrelated debts that the Griffins owed and apparently hoped to pay from the

proceeds.  It appears from this document that the Griffins needed $1,845,043 to solve their

immediate financial problems.

In any event, it was clear that the Griffins were unhappy, and wanted to renegotiate the

settlement.  (Tr. (7/27), at 46.)  They wanted more money, and demanded a waiver of the

commission and an adjustment based on the real property taxes dating back to June 3, 2004.

(See id. at 46.)  Scher asked Orseck if there was anything Orseck could do to get out of the

settlement. (Id. at 45.)  According to Orseck, he told the Griffins and Scher that the settlement

was binding, (id. at 95), but informed Scher that he would try to get out of it by arguing that the

settlement was still technically subject to a stipulation and court order.  (Id. at 45, 46-47.)

On July 28, 2005, the Griffins ran into Gene Barbanti, Helen-May's expert witness, at a local restaurant. (Tr. (7/24), at 3.) The Griffins testified that Barbanti told them about the court hearing on July 20, 2005, (id. at 4 & 20; Tr. (7/19), at 112), and that Orseck had done a great job. (Tr. (7/24), at 4 & 20; Tr. (7/19), at 113.) Irene understood Barbanti's "great job" statement to refer to the settlement, (Tr. (7/24), at 20-21), and Paul also testified that Barbanti might have said or implied that there was a settlement. (Tr. (7/19), at 113.)

After speaking with Barbanti, the Griffins ran into Orseck, purely by chance, at the same restaurant on the same evening. (Tr. (7/24), at 4 & 21-22.) Oddly, they failed to tell Orseck about what Barbanti had said, (id. at 22), and once again failed to mention their prior communications with Kirk regarding a settlement. (Id. at 22; Tr. (7/19), at 117.) According to the Griffins, Orseck advised them to come to his office the following morning, (Tr. (7/24), at 4), but when they showed up, they learned that Orseck had canceled the meeting. (Id. at 5.)

Prior to August 5, 2005, Orseck had not, according to the Griffins, confirmed the settlement. To the contrary, he had maintained that the case was not settled. He said that the debtor had to set up an escrow account, and the Griffins had to negotiate a settlement to get the money. (Id. at 81-82.) On August 5, 2005, however, the Griffins received a copy of the debtor's notice of settlement and proposed order memorializing the settlement. (See DX 20.) The proposed order approved the settlement "set forth on the record" of the July 20th hearing.

Scher, who had become more directly involved in dealing with Orseck, sent an e-mail to Orseck that same day. Scher questioned why the debtor would say there was a settlement at the same time that Orseck had been telling the Griffins that they had to decide whether to accept the settlement. (DX 20.) It was "clear" to him that a settlement had been put on the record during a

hearing on July 20, 2005, and he was astounded that Orseck was still denying it. (Tr. (7/24), at

84-85.) Scher realized that the Griffins had to get a copy of the July 20th transcript. (Id. at 98.)

Paul also sent a fax to Orseck, stating that he had received the debtor's proposed order,

asked what it meant, and emphasized that "[t]he figures are not what we discussed, and we

certainly wouldn't agree to this." The "figures" referred to the settlement figure in the proposed

order, and the word "discussed" referred to the numbers in his July 22, 2005 "Settlement Offer,"

(DX 15), that he had sent to Orseck. (Tr. (7/19), at 125.)

Despite Orseck's apparent lies and unauthorized settlement, the Griffins had still not fired

him as of August 5, 2005, and they expected Orseck to file objections to the proposed order. (Id.

at 132-133.) Scher explained the reason for their delay in firing Orseck. The Griffins had to

continue to rely on Orseck because they were under time and financial constraints. (Tr. (7/24),

at 90.) Scher lacked the expertise to take over the case, and tried to find Helen-May another

lawyer, but the Griffins did not have the money to pay him. (Id. at 90-91.) Scher also held out

(faint) hope (and presumably told the Griffins) that Orseck might be telling the truth that there

was no settlement. (See id. at 90.)

On August 10, 2005, Orseck wrote a letter to Mr. Frankel stating that the case was "not

yet settled, as you know, and we will be filing timely objections." (DX 23.) The letter did not

state that Orseck lacked authority. Moreover, Orseck never told the debtor's counsel that he

lacked the authority to make the settlement, or that the Griffins had to sign it. (Tr. (7/27), at 95-

96.)

On August 11, 2005, Orseck filed objections on behalf of Helen-May to the notice of

14

settlement and proposed order.  (DX 26.)  The objections were quite brief: (1) the "case is not settled," (2) the settlement omitted several material elements, and (3) it required Helen-May's written approval.  Orseck's objections did not state that Orseck lacked authority, although the requirement of written approval implied as much.

Scher received a copy of the objections on August 11th, but was not sure whether he received them before they were filed by Orseck.  (Tr. (7/24), at 102.)  Scher marked up the objections, and sent the "Amended Objections" to Orseck the same day.  (DX 27.)  His handwritten interlineations stated, _inter alia_, that Helen-May "did not agree to the terms contained in the Proposed Order of Settlement," and the "amount to be paid [Helen-May] in the proposed Order of settlement is not acceptable to [Helen-May]."  It included a question at the end directed to Orseck: "Gerry, should you request that the matter be set down for a Hearing?"  Orseck never amended the objections or requested a hearing.

On August 30th, Scher finally obtained a copy of the July 20th transcript.  The transcript confirmed that Orseck had made the settlement he had consistently denied.  Both prior to and after August 30th, Scher pressed Orseck to schedule a meeting with the debtor's attorneys.  (DX 28, 34, 36; (Tr. (7/27), at 55.)  The purpose of the settlement meetings was to renegotiate the terms of the settlement, (Tr. (7/27), at 56), and included dealing with the real estate commissions and the tax adjustments.  (Id. at 108-109.)

The meeting did not take place during Orseck's watch, and Helen-May finally replaced Orseck with its former attorney, David Carlebach, on September 15, 2005.  (DX 42.)  Carlebach put in a more complete set of objections to the proposed order, and specifically argued that Orseck lacked authority to settle the case.  As part of that submission, Orseck signed an affidavit

that stated,

> I was under the mistaken impression that I had authority to settle the case,
> but after refreshing my recollection with respect to the communications I had with
> the client leading up to the hearing, as well as the day of the hearing, I realized
> that I never had authority to settle this case in any fashion.

(Tr. (7/27), at 110.)  Orseck testified that he signed the affidavit because Carlebach and the

Griffins threatened that he would have trouble if he refused.  (Id. at 111.)  He did not explain

why Carlebach's threats were of such a concern that they induced him to sign an affidavit he

would not have otherwise signed.

The debtor then moved to enforce the settlement, (ECF Doc. # 44), the Court treated the

motion, with the parties' consent, as one for summary judgment on the issue of apparent

authority, and denied it in the Opinion.  The trial on the issue of Orseck's authority followed.

## DISCUSSION

**A.    Introduction**

The Opinion discussed the rules governing the authority of an attorney to settle a case:

> The decision to settle a case rests with the client.  Pereira v. Sonia
> Holdings, Ltd. (In re Artha Mgmt., Inc.), 91 F.3d 326, 329 (2d Cir. 1996); United
> States v. International Bhd. of Teamsters, Chauffeurs, Warehousemen and
> Helpers of America, 986 F.2d 15, 19 (2d Cir. 1993)("Teamsters"); Fennell v. TLB
> Kent Co., 865 F.2d 498, 501 (2d Cir. 1989).  An attorney can bind his client to a
> settlement only when the client has authorized him to so.  An attorney may
> nevertheless enter into a binding settlement if he has apparent authority, and the
> opposing attorney has no reason to doubt it.  Teamsters, 986 F.2d at 19; Janneh v.
> GAF Corp., 887 F.2d 432, 436 (2d Cir. 1989).  In a case arising under federal law,
> the scope of the agent's authority is determined under the federal common law,
> Artha Mgmt., 91 F.3d at 328; Teamsters, 986 F.2d at 20, but New York and
> federal law are essentially the same on this point.  See Fennell, 865 F.2d at 501.

> Because of the unique nature of the attorney-client relationship and the
> public policy favoring settlements, an attorney who enters into a settlement,
> particularly one on the record in open court, is presumed to have the actual

authority to bind his client. Artha Mgmt., 91 F.3d at 329. "In accordance with that presumption, any party challenging an attorney's authority to settle a case under such circumstances bears the burden of proving by affirmative evidence that the attorney lacked authority." Id.; accord Teamsters, 986 F.2d at 20("The burden of proving that an attorney entered into a settlement agreement without authority is not insubstantial."); Conway v. Brooklyn Union Gas Co., 236 F. Supp. 2d 241, 247(E.D.N.Y. 2002)("[C]ourts will presume that an attorney who enters into a settlement agreement has authority to do so."); In re Cuffee, 232 B.R. 53, 56 (E.D.N.Y. 1999)("A stipulation of settlement on the record in Court is one of the strongest and most binding agreements in the field of law."); Hallock v. State, 474 N.E.2d 1178, 1180-81 (N.Y. 1984)(absent fraud, collusion, mistake or accident, the client challenging an oral settlement made on the record must show that the attorney "was without authority of any sort to enter into the settlement, and therefore no contract ever came into being").[8]

(Opinion at 10-12.)

**B.     Actual Authority**

Helen-May demonstrated at the trial that Orseck lacked the actual authority to settle the case. Initially, although both Griffins testified that any settlement required the return of the Property, the evidence showed otherwise. They discussed settlement scenarios with Orseck and Scher that involved the transfer of the Property. They knew or had to know that Orseck and the debtor's counsel were discussing settlements that involved the transfer of the Property; Orseck was presenting them with settlement offers, and they were rejecting them. Lastly, Paul was peppering Orseck with "settlement" letters describing his monetary considerations if the Property was going to be transferred, and these letters were intended by Paul to provide a basis for discussion with the debtor's counsel. Moreover, the Griffins were under severe financial restraints, and after the June 28th hearing and the possible confirmation of the debtor's plan, they

---

[8]     Hallock referred to N.Y.C.P.L.R. 2104 (McKinney 1997 & Supp. 2005) which provides, in substance, that a settlement made on the record in open court is binding even if it is not reduced to writing and signed by the parties. Although there is some question whether this provision applies to oral stipulations governed by federal law, "the federal rule regarding oral stipulations does not differ significantly from the New York rule." Monaghan v. SZS 33 Assocs., L.P., 73 F.3d 1276, 1283 n.3 (2d Cir. 1996).  (Footnote in original.)

became more amenable to a cash payment.

Nevertheless, the Griffins never authorized Orseck to settle for so little.  Rather, they repeatedly insisted on amounts that Orseck considered unrealistic, (Tr. (7/27), at 27, 73, 75, 83, 119), bizarre, (id. at 126), and ridiculous.  (Id. at 30, 31, 32.)  Orseck viewed the Griffins as naïve when it came to financial matters, and Paul's "unrealistic" settlement memos increased Orseck's frustration.

Furthermore, I do not believe Orseck's testimony that he was merely seeking reassurance of his settlement authority when he called the Griffins on the morning of July 20th.  Orseck testified that he thought he had the authority when he left the July 19th meeting with the Griffins.  When asked why he sought reassurance the next day, he testified that in the interim, he had received another unreasonable settlement letter from Paul.  (Tr. (7/27), at 120.)  But the settlement letter he was referring to was faxed on July 18th, (see DX 9), as Orseck acknowledged.  (Tr. (7/27, at 121.)  Paul's July 18th letter didn't prompt Orseck's concern.  Instead, Helen-May had never authorized any settlement, and Orseck called on July 20th to get that authority to settle.

He never got it.  Although Orseck and Paul disagreed on precisely what was said during the brief July 20th telephone conversation, both agreed that Paul did not give Orseck the authority to settle within the range of $300,000 to $400,000 over the contract price.  Paul testified that he told Orseck to get the Property back, and Orseck said that the call was cut off before Paul could respond.

It is difficult to explain why Orseck did not try to call Paul back, right then or during the

18

lunch break, and instead, agreed to the settlement on the record after the lunch recess.  Even by

his own testimony, he needed reassurance of his authority.  The answer is that he was frustrated

by the Griffins' naiveté and unreasonableness, thought he knew better, and substituted his

judgment for their wishes.  It may be that Orseck enjoyed a more realistic view of an appropriate

settlement, but the Griffins never authorized him to accept the settlement he made, and Orseck

ultimately conceded that fact in the affidavit submitted by Carlebach and during his cross-

examination.  (See Tr. (7/27), at 122.)  Accordingly, I find that Orseck lacked the actual

authority to enter into the settlement.


**B.      Apparent Authority**

The more difficult question concerns Orseck's apparent authority to settle the case.  As

discussed in the Opinion:

> Apparent authority consists of two elements: (1) a manifestation by the
> principal that the agent has authority and (2) reasonable reliance on that
> manifestation by the person dealing with the agent.  See FDIC v. Providence
> College, 115 F.3d 135, 140 (2d Cir. 1997); Herbert Construction Co. v.
> Continental Ins. Co., 931 F.2d 989, 993-94 (2d Cir. 1991); RESTATEMENT
> (SECOND) OF AGENCY § 27 (1958).  Only the principal can manifest the attorney's
> authority; the attorney cannot create apparent authority by his manifestation
> alone.  Teamsters, 986 F.2d at 20.  Furthermore, apparent authority cannot be
> based on private communications between the lawyer and his client that are not
> disclosed to opposing counsel.  See Fennell, 865 F.2d at 502.

> "[A] client does not create apparent authority for his attorney to settle a
> case merely by retaining the attorney."  Id.; accord Artha Mgmt., 91 F.3d at 329.
> Accordingly, while the presumption that attends open court settlements is a
> powerful one, the cases require more to support a finding of apparent authority.
> In addition to affirmative statements or acts by the principal directed at the third
> party, indicia of apparent authority include the attorney's unrefuted statements,
> made in his client's presence, that he has authority to settle, Conway, 236 F.
> Supp. 2d at 248; the attorney's participation in settlement discussions with the
> client's knowledge, Clark v. Bristol-Myers Squibb & Co., 761 N.Y.S.2d 640, 643
> (N.Y. App. Div. 2003); see Teamsters, 986 F.2d at 20 (client allowed

19

"unauthorized" attorney to negotiate modification to settlement); <u>Alvarez v. City of New York</u>, 146 F. Supp. 2d 327, 335 (S.D.N.Y. 2001)(client and attorney participated in two lengthy settlement conferences, without advising adversary or court of limit on attorney's authority); the attorney's appearance at court conferences conducted pursuant to rules that require the attorney to have settlement authority, <u>Hallock</u>, 474 N.E.2d at 1182; <u>Stoll v. Port Auth of New York and New Jersey</u>, 701 N.Y.S.2d 430, 431 (N.Y. App. Div. 2000); <u>Bauer v. Lygren</u>, 493 N.Y.S.2d 815, 816 (N.Y. App. Div. 1985); <u>Collazo v. New York City Health & Hosps. Corp.</u>, 477 N.Y.S.2d 662, 663 (N.Y. App. Div. 1984), and the client's delay in denying the attorney's authority.  <u>Teamsters</u>, 986 F.2d at 20; <u>Conway</u>, 236 F. Supp. 2d at 248; <u>Clark v. Bristol-Myers Squibb & Co.</u>, 761 N.Y.S.2d at 643.

(<u>Opinion</u> at 12-14.)

The evidence demonstrated that Orseck also lacked the apparent authority to settle the case.[9]  There was no proof of any direct manifestations by Helen-May, and the question of Orseck's apparent authority turns on the permissible inferences that flow from two facts.  First, the Griffins knew or should have known from their communications with Orseck and Scher that Orseck and the debtor's counsel were discussing settlement prior to July 20, 2005.  Second, the Griffins continued to use Orseck after they learned that he had lied to them and entered into the unauthorized settlement, and encouraged him to continue to negotiate with the debtor.

While Orseck may have been authorized, expressly or impliedly, to <u>engage</u> in settlement negotiations, the Griffins never represented or manifested to the debtor that Orseck was authorized to make the settlement that he did.  They were not present when Orseck discussed settlement with the debtor's counsel or with the Court.  <u>Cf.</u> <u>Alvarez v. City of New York</u>, 146 F.

---

[9]    The Opinion stated that the settlement on the record created a rebuttable presumption of actual authority, (<u>Opinion</u> at 12), and did not address the burden of proving the existence (or lack) of apparent authority.  The parties did not address the question in their post-trial submissions.  Nevertheless, the evidence showed that Orseck lacked apparent authority, and it is unnecessary to decide who had the burden of proof.

Supp. 2d at 335(apparent authority existed where client and attorney participated in settlement conferences and failed to advise the adversary or court of limits on attorney's authority); Clark v. Bristol-Myers Squibb & Co., 761 N.Y.S.2d at 643 (upholding attorneys apparent authority where, inter alia, the attorney had engaged in settlement discussions in the client's presence as well as in her absence).  Moreover, the Griffins rejected every settlement proposal that the debtor put forward, and Orseck's July 19th letter to Krinsky described Griffin – presumably Paul -- as the "problem."

In fact, Orseck's blustering letters about his "marching orders" even gave Krinsky pause. He asked Orseck if he had authority to settle soon after Orseck replaced Carlebach in May 2005, and asked again when the negotiations heated up after the June 28th hearing.  (Tr. (7/24), at 171-72.)  He also asked if Orseck intended to relay any settlement negotiations to the Griffins.  (Id. at 172.)  Krinsky had grounds for suspicion, and Helen-May's knowledge of the settlement discussions did not confer apparent authority on Orseck to agree to a specific settlement.

Furthermore, although Helen-May continued to use Orseck even after it discovered his lies and unauthorized settlement, the circumstances do not warrant a finding that they acquiesced in or ratified the settlement or his authority.  To the contrary, they consistently fought the settlement, and tried to get Orseck to clean up his mess.  The Griffins were admittedly slow in responding to the growing evidence that Orseck had entered into an unauthorized settlement. They did not follow up with Orseck after they received Kirk's congratulations, except to send one e-mail to Orseck, which they then failed to follow up.  Nor did they probe Barbanti's statements on July 28th that a hearing had occurred and Orseck had entered into a settlement.

Moreover, it took them 25 days after they received the proposed order to obtain a copy of the July 20th transcript.

Nevertheless, I credit Scher's explanation that they were essentially stuck with Orseck, and hoped to make the best of a bad situation by renegotiating the settlement. In this regard, I credit the testimony that Orseck lied about the status of the settlement. It was a done deal, and not something that still required the Griffins' approval before it became binding. While the nuances of the settlement procedure may have confused the Griffins, they did not fool Scher. This explains Scher's shock when he received the notice of settlement and proposed order on August 5, 2005, and sent an e-mail confronting Orseck about his earlier misstatements. (See DX 20.) Orseck had been reassuring the Griffins and Scher with false statements about the status of the settlement, and this explains part of the reason for the delay.

The proposed order confirmed that Orseck had lied, and had actually entered into a settlement on the record. The Griffins could not hire another attorney given their financial constraints and the limited amount of time to object to the proposed order. Scher became more involved, but Helen-May still needed Orseck to file an objection and arrange the meeting with the debtor's counsel. Nevertheless, Helen-May immediately repudiated the settlement, even if it did not intone the phrase "lack of authority," although the objection based on the need for Helen-May's written approval can be fairly read to mean that. Given the facts, Helen-May's continued reliance on Orseck, even after learning about his unauthorized settlement, did not imply that they acquiesced in or ratified it, or that Orseck had the apparent authority to enter into it in the first place. To the contrary, the Griffins repudiated the settlement within a week of receiving the

proposed order, continued to rely on Orseck to extricate Helen-May from its quandary, and fired him once they were able to rehire their former attorney.

I conclude, therefore, that Orseck lacked apparent as well as actual authority to enter into the settlement, and the debtor's motion to enforce the settlement is denied.  The foregoing constitutes the Court's findings of fact and conclusions of law.  FED. R. CIV. P. 52(a).  The parties are directed to schedule a status conference promptly to address the disposition of this chapter 11 case.  Settle order on notice.

Dated: New York, New York
       February 23, 2007

                              /s/ *Stuart M. Bernstein*
                              STUART M. BERNSTEIN
                         Chief United States Bankruptcy Judge