```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re:                                                      :
                                                            :   Chapter 7
        IN RE KOLLEL MATEH EFRAIM, LLC.,                    :   Case No. 04-16410 (SMB)
        a/k/a MATEH EFRAIM LLC, a/k/a                       :
        KOLEL MATEH EFRAIM,                                 :
                                                            :
                        Debtor.                             :
------------------------------------------------------------X
ROBERT GELTZER, as Chapter 7 Trustee of the                 :
Estate of Kollel Mateh Efraim, LLC, a/k/a                   :
Mateh Ephraim LLC, a/k/a Kollel Mateh Efraim,               :
                                                            :
                        Plaintiff,                          :
                                                            :
        -- against --                                       :   Adv. Proc. No.: 04-4545
                                                            :
HELEN-MAY HOLDINGS, LLC, and                                :
IRENE GRIFFIN,                                              :
                                                            :
                        Defendants.                         :
------------------------------------------------------------X
ROBERT GELTZER, as Chapter 7 Trustee of the                 :
Estate of Kollel Mateh Efraim, LLC, a/k/a                   :
Mateh Ephraim LLC, a/k/a Kollel Mateh Efraim,               :
                                                            :
                        Plaintiff,                          :
                                                            :
        -- against --                                       :   Adv. Proc. No.: 08-1265
                                                            :
JACK LEFKOWITZ and ABRAHAM                                  :
STEINWURZEL,                                                :
                                                            :
                        Defendants.                         :
------------------------------------------------------------X
```

**MEMORANDUM DECISION SUSTAINING
OBJECTION TO ADMINISTRATIVE CLAIM**

**A P P E A R A N C E S:**

LAW OFFICES OF DAVID CARLEBACH
Attorney for Helen-May Holdings, LLC
40 Exchange Place
New York, New York 10005

    David Carlebach, Esq.
        Of Counsel

HELLER, HOROWITZ & FEIT, LLP
Attorneys for Jack Lefkowitz and Abraham Steinwurzel
292 Madison Avenue
New York, New York 10017

    Eli Feit, Esq.
    Stuart A. Blander, Esq.
        Of Counsel

SQUIRE, SANDERS & DEMPSEY LLP
Attorneys for Robert L. Geltzer, Trustee
30 Rockefeller Plaza
23rd Floor
New York, New York 10036

    Robert A. Wolf, Esq.
    Daniel C. Mazanec, Esq.
        Of Counsel

BACKENROTH FRANKEL & KRINSKY, LLP
Objectors <u>Pro Se</u>
489 Fifth Avenue
New York, New York 10017

    Scott Krinsky, Esq.
        Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

    Pursuant to a settlement described below, the Trustee agreed to allow an administrative claim in favor of Helen-May Holdings, LLC ("Helen-May") at the rate of $1,500 per day for the approximate three years that the debtor occupied Helen-May's property. The settlement reserved

to parties-in-interest the right to object to the administrative claim. The debtor's former attorneys, Backenroth Frankel & Krinsky, LLP ("BFK"), and Jack Lefkowitz and Abraham Steinwurzel (the "Fiduciary Defendants"), defendants in the above-captioned adversary proceeding entitled Geltzer v. Lefkowitz, Adv. Pro. No. 08-1265 (the "Fiduciary Litigation"), filed objections.

The Court conducted an evidentiary hearing on March 10, 2010. At the conclusion of Helen-May's direct case, the Fiduciary Defendants moved for judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, made applicable by Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure.

For the reasons that follow, the Fiduciary Defendants' motion is granted. Accordingly, Helen-May's administrative claim under the settlement and in connection with the Fiduciary Litigation will be fixed at zero. This conclusion does not affect the prior judgment resulting from the debtor's failure to make adequate protection payments ordered by the Court.

## BACKGROUND[1]

The facts underlying the instant dispute are detailed in the Court's Memorandum Decision Ordering an Evidentiary Hearing to Determine Administrative Claim and Consolidating Issue with Trial in Related Adversary Proceeding, dated Aug. 18, 2009 (the "August 18 Opinion") (ECF Doc. # 272).[2] I assume familiarity with that opinion, and repeat only the facts necessary to this decision.

---

[1] Unless otherwise noted, all ECF Doc. #s refer to Case No. 04-16410.

[2] The August 18 Opinion is also available at In re Kollel Mateh Efraim, LLC, Adv. Proc. No. 04-4545, 2009 WL 2929430 (Bankr. S.D.N.Y. Aug. 18, 2009).

3

On April 29, 2004, Helen-May executed a contract of sale (the "Contract") with Aron Fixler to sell Fixler certain real property (the "Property") located in Sullivan County, New York for $1,400,000. (Creditor's Exhibit ("CX") 1.) The Property consists of a resort hotel located on 60 to 77 acres, with seven major buildings, six residential buildings, and rooms accommodating a total of 103 guests. (Transcript of hearing held on March 10, 2010 ("Tr."), at 14–15 (ECF Doc. #278).) It also contains a pool, shuffleboard, a catering facility, access to the Delaware River, and large fields for hiking. (Tr. at 15.) The Contract was initially scheduled to close on June 1, 2004.

Fixler assigned the Contract to the debtor. The debtor and Helen-May did not close on the scheduled date, and instead, entered into a letter agreement, dated June 3, 2004 (the "Occupancy Agreement"). (CX 2.) In relevant part, the Occupancy Agreement extended the closing date until September 27, 2004, and granted the debtor the express right to occupy and operate the Property in the interim. In consideration for the extension and occupancy rights, the debtor agreed to pay numerous monthly operating and other expenses. In addition, if the debtor failed to close by September 27, 2004, it agreed to thereafter pay $1,500 per day (the "Daily Penalty") until it quit the premises and removed its belongings. (Occupancy Agreement at 3.)

The parties did not close on by September 27, 2004, and entered into a second agreement extending the closing date to November 29, 2004. The extension obligated the debtor to make two lump sum payments aggregating approximately $41,000, and all other provisions of the Occupancy Agreement remained the same.

4

A.     **The Prior "Adequate Protection" Order**

The parties had not yet closed when, on October 4, 2004, the debtor filed its chapter 11 petition. Early in the chapter 11 case, former Bankruptcy Judge Blackshear directed the debtor to pay Helen-May $5,000 per month, but there is no transcript or order memorializing what led to Judge Blackshear's order. In June 2005, Helen-May moved, <u>inter alia</u>, to compel the debtor to pay use and occupancy at the rate of $12,000 per month.

The Court conducted an evidentiary hearing on July 20, 2005. Gene Barbanti, a real estate broker and consultant and Helen-May's only witness, testified regarding the reasonable rental value of the Property. In substance, he stated that the reasonable rental value of the Property was directly related to the expected return on the investment of $1.4 million, the value he ascribed to the Property based on the Contract price. Barbanti opined that an investor would expect at least a 10% return on his money, and concluded that the reasonable annual rental was $140,000, plus the amount needed to pay taxes.

The debtor did not cross-examine Barbanti or provide any evidence, and the Court concluded that the reasonable rental value of the Property was $140,000 annually ($11,667 per month) plus the real estate taxes. I directed the debtor to make those monthly payments as "adequate protection" on a going forward basis, and told counsel to settle an order. We then broke for lunch.

Following the lunch break, counsel announced a settlement on the record. However, Helen-May immediately repudiated the settlement, nearly two years of litigation ensued, and I ultimately concluded that Helen-May's lawyer lacked the authority to enter into the settlement. (<u>Post-Trial Findings of Fact and Conclusions of Law</u>, dated Feb. 23, 2007 (ECF Doc. # 96).) As

5

a result of the settlement and subsequent proceedings challenging the settlement, the adequate protection order that I had directed on the July 20, 2005 record had never been memorialized or entered.

Of greater concern to Helen-May, the debtor had made few if any of the payments directed by the Court. Helen-May moved to compel payment, the Court ordered the debtor to commence paying monthly adequate protection in the amount of $13,553 and to tender the unpaid net balance in the sum of $210,120 that had accrued since July 2005 within 30 days. (Order, dated Apr. 25, 2007 (ECF Doc. # 119).) The debtor made only one payment, and failed to pay the balance. As a result, the Court entered a judgment, dated August 10, 2007, in the amount of $245,779. (See Order & Judgment, dated Aug. 10, 2007 ("Judgment") (ECF Doc. # 186).)

The debtor filed a notice of appeal from the Judgment on August 20, 2007. (ECF Doc. # 189.) The District Court dismissed the appeal by order dated January 30, 2008 after the Trustee advised the District Court that he wished to withdraw it. (ECF Doc. # 247.)

**B.    The Settlements**

   **1.    The First Settlement**

On October 25, 2007, the Court converted the chapter 11 case to case under chapter 7, and Robert L. Geltzer, Esq. was appointed the Trustee. On November 20, 2007, the Trustee and Helen-May entered into a stipulation pursuant to which the Trustee consented to the eviction of the debtor from the Property.[3]

---

[3] The Court had previously granted Helen-May's motion for relief from the stay by Order dated June 5, 2007. (ECF Doc. # 137.)

6

The Trustee and Helen-May also entered into a settlement agreement, which the Court approved. In relevant part, the settlement granted Helen-May a chapter 11 administrative claim, inclusive of the Judgment. The amount of the claim would be $1,500 per day (the Daily Penalty) multiplied by the number of days that the debtor had occupied the Property after the closing date (September 28, 2004 through October 29, 2007), or roughly $1,642,500. BFK objected to the allowance of an administrative claim in the amount of $1,500 per day, and argued that Helen-May's use and occupancy claim should be limited to the $245,799 Judgment. (Objection by Backenroth Frankel & Krinsky, LLP to the Trustee's Motion to Approve Its Settlement with Helen-May Holdings, LLC, dated May 5, 2008, at ¶ 42 (Adv. Proc. No. 04-4545, ECF Doc. # 60).) Helen-May's administrative claim was reserved for future determination. The settlement was contingent on the sale of the Property by a certain date, and when the sale did not occur, the settlement lapsed.

**2.     The Second Settlement**

The Trustee and Helen-May eventually entered into a second settlement (the "Second Settlement"), which was approved with certain modifications. (See Stipulation and [Proposed] Order Amending Settlement Between Trustee and Helen-May Holdings, LLC, dated Feb. 19, 2009 (Adv. Pro. No. 04-4545, ECF Doc. # 66).) In relevant part, the Second Settlement essentially recognized Helen-May's judgment lien in the net proceeds, totaling $132,812.38, from the earlier sale of the estate's two parcels of real property. The Trustee paid Helen-May $30,000 on account of the Judgment, and Helen-May subordinated the balance of its Judgment claim to the remaining sale proceeds ($102,812.38) and the first $60,000 of other funds collected by the Trustee to the payment of allowed chapter 7 administrative claims. (Id. at ¶ 2(a).)

7

Otherwise, its claim in the sum of $102,812.38 would be superior to all other chapter 11 and chapter 7 administrative claims.

In addition, the Second Settlement, as modified, granted Helen-May an allowed administrative claim in the difference between the aggregate Daily Penalty that accrued between the commencement of the chapter 11 case and the debtor's eviction and the amount collected by Helen-May under the Second Stipulation, as modified. The ultimate allowance of the administrative claim was subject, however, to the objection already lodged by BFK, and any objection filed by other parties in interest. The Second Settlement was not contingent on a sale, and the terms of the first settlement otherwise remained in full force and effect.

### 3. The Objections

Like BFK, the Fiduciary Defendants also filed an objection to the allowance of an administrative claim in the sum of $1,500 per day. BFK repeated its earlier objections, and asserted that Helen-May's damages for use and occupancy should be limited to the Judgment plus the $140,000 down payment on the Contract that Helen-May had retained. (Objection by Backenroth Frankel & Krinsky, LLP to Awarding Helen-May Holdings, LLC an Administrative Claim, dated Apr. 3, 2009, at ¶ 42 (Adv. Proc. No. 04-4545, ECF Doc. # 77).) The Fiduciary Defendants argued that the Daily Penalty was unenforceable. (Objections to Settlement, dated Apr. 3, 2009, at ¶¶ 4–5 (Adv. Proc. No. 04-4545, ECF Doc. # 76).)

The Court concluded in the August 18 Opinion that it would reopen the record to take evidence and consider (or reconsider) the reasonable rental value of the Property during the debtor's approximate three-year use and occupation. In addition, the Court consolidated the issue of the amount of Helen-May's administrative claim raised in the contested matter with the

8

same issue raised in connection with the Fiduciary Litigation, and determined to try them at the same time. See FED. R. CIV. P. 42(a) (made applicable to the Fiduciary Litigation by FED. R. BANKR. P. 7042 and the contested matter by FED. R. BANKR. P. 9014(c)).

**C.    The March 10, 2010 Hearing**

The Court conducted an evidentiary hearing on March 10, 2010. Helen-May called Paul Griffin, Helen-May's manager and the husband of its sole member, Irene Griffin, as its only witness.

Griffin testified that after a stint in the Navy, he was employed as a professional musician for most of his working life. (Tr. at 6.) He entered the hospitality industry in the late 1980s, when he and his wife purchased and transformed a large Victorian residence into a bed and breakfast, which they operated as the Griffin House from 1990 through 2009. (Tr. at 7–8.) Griffin also served as a Director of the Sullivan County Chamber of Commerce, (Tr. at 8), and sat on the Sullivan County Tourism Board for "six or seven years." (Tr. at 9.) In these positions, Griffin discussed marketing strategies for Sullivan County's tourism and hospitality industries. (Tr. at 8–9.) In 2000, CMVG, a partnership composed of Griffin and three others, purchased the Property, which he and his wife, Irene, thereafter managed. (Tr. at 10–11, 15.)

At this point, Helen-May sought to qualify Griffin as an expert in the hospitality industry, or alternatively, permit Griffin to testify as a lay witness regarding the fair rental value of the Property. (Tr. at 11.) The Fiduciary Defendants objected. Expertise in the hospitality industry had no bearing on the fair rental value of the Property, and although an owner might be able to provide lay testimony relating to value, Griffin was not an owner of Helen-May. (Tr. 11–12.)

9

The Court sustained the objection to Griffin's qualifications as an expert in the hospitality industry, (Tr. at 12), but overruled the objection to his testifying as a lay witness. (Tr. at 13.) Nevertheless, the Court warned Helen-May's attorney that he had thus far failed to lay a foundation for Griffin's lay testimony regarding the fair rental value of the Property, and without a foundation, his testimony would not be given any weight. (Tr. 13–14.)

Following the Court's admonition, Helen-May's attorney attempted to lay the missing foundation. While CMVG owned the Property, the Griffins managed it. In January 2004, Helen-May purchased the Property at a foreclosure sale for $715,000, (Tr. at 47–48, 70), with the dual goal of operating it as a resort hotel and marketing it for sale.[4] (Tr. at 16.)

Griffin testified that the "rack rate," or average price, of hotel rooms in Sullivan County between 2004 and 2007 was $150, while the typical occupancy rate was 50 percent. If these rates were applied to the Property's 103 rooms, it would have generated $2.3 million in annual gross revenue. (Tr. at 26.) In addition, the Property would have been able to generate an additional $1.5 million in meal plans, (Tr. at 32–33), and $250,000 in events. (Tr. at 33.) Combined, Griffin estimated that the annual gross revenue of the hotel should have been approximately $4 million for 2004 through 2007, with annual net revenue of $1.4 million.[5] (Tr.

---

[4] As noted, Helen-May entered into the Contract with Fixler three months later.

[5] In 2004, Helen-May paid monthly expenses relating to the Property that included the mortgage, taxes, insurance, maintenance and fuel costs. (Tr. at 54–55.) The largest monthly expense was the mortgage. In June 2004, Helen-May was paying $9,750, (Tr. at 55; Occupancy Agreement at 2), but the monthly cost increased to $13,000 by the end of 2004 as a result of a refinancing, (Tr. at 59), increased to $16,500 sometime in 2005, (Tr. at 59), and by 2006, had risen to $25,000. (Tr. at 62–63.)

Griffin also testified about the other expenses listed in the Occupancy Agreement. Although he testified that certain of the expenses, especially the taxes, increased each year, he could not place a number on the increased amounts. (See Tr. at 59–63.)

10

at 33.) Griffin believed that the fair market rental value of the Property "would be roughly $100,000 a month" based on the $1.4 million projection per year, although Griffin qualified his opinion stating that "hoteliers generally think in terms of renting . . . out rooms. They don't rent out an entire property." (Tr. at 44.)

Cross-examination undercut the foundation that Helen-May had attempted to establish. Griffin conceded that he lacked personal knowledge of the fair market rental value of properties comparable to the Property. (Tr. at 45–46.) Griffin also showed surprisingly little knowledge of the operations of the Property during the period that he acted as "de facto manager," and what he did know indicated that he had vastly overestimated its income earning potential. Although he testified that the Property should have generated net income of $1.4 million, he did not know the annual revenue, cash flow or occupancy rate for the Property between 2000 and 2003. (Tr. at 38–39, 54.) Furthermore, he conceded that the Property's general performance was like a "rollercoaster," because September 11th had wreaked havoc on the hospitality industry. (Tr. at 16.) Furthermore, Helen-May had never attempted to lease the Property, (Tr. at 45–46), and no one had expressed a desire to lease the Property. (Tr. at 47.)

Griffin also testified about the debtor's use of the Property. Between April 2004 and late 2007, when the stay was lifted and the debtor was evicted, Griffin was not allowed on the Property, (Tr. at 65), except on two occasions. (Tr. at 71.) He was nevertheless able to observe that the Property was used as a resort during the summer of 2004 and during Sukkoth in the fall of that year. He also observed families at the Property during 2005, but he did not know whether it was used as a summer camp for boys in 2005, as it had been in 2004. (Tr. at 65.) He also believed that it was being used as a resort during portions of 2006 and 2007. (Tr. at 67.) Finally,

11

the debtor's Statement of Financial Affairs stated that the debtor had earned income of $300,000 in 2004.  (ECF Doc. # 7.)

After Griffin completed his testimony, Helen-May stated that it had no other witnesses, (Tr. 78–79), and the Fiduciary Defendants moved for a judgment on partial findings (their counsel did not use the phrase) on the ground that Helen-May had failed to make out a prima facie case establishing its administrative claim.  (Tr. at 79–80.)  During colloquy, the Court questioned the strength of Helen-May's evidence, but reserved decision on the motion and requested briefing on two issues.  (Tr. 82–83.)

After further colloquy, (Tr. 83–95), the Court reopened the proof to allow Helen-May to put in additional evidence.  (See Tr. at 96.)  Helen-May read into the record certain portions of Rabbi Steinwurzel's deposition testimony in which he stated that he paid Camp Sharieh Yosher between $40,000 and $45,000 to allow his students to use its property during the summer of 2008.  (Tr. at 99–100.)  These included some of the same students that had studied with him in 2007.  (Tr. at 100.)

**DISCUSSION**

Rule 52(c) of the Federal Rules of Civil Procedure governs the granting of a judgment on partial findings. It states:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

A court may award a judgment on partial findings when (1) the proponent of a claim for relief fails to demonstrate the elements of its claim in fact or in law or (2) the proponent of the claim has established one of the opposing party's defenses as a matter of fact or law. 9 JAMES WM. MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 52.50[2], AT 52-124 (3d ed. 2010). The procedure is designed to conserve time and resources by making it unnecessary for a court to take evidence on additional facts when the result would not be different even if the additional facts were established. Id. When considering the motion, a court is not required to draw any special inferences in favor of the non-moving party. Id. § 52.51 at 52-126.

Section 503(b)(1)(A) of the Bankruptcy Code grants administrative expense status to the "actual, necessary costs and expenses of preserving the estate."[6] The party claiming entitlement to an administrative expense bears the burden of proof. E.g., In re Mid Region Petroleum, Inc., 1 F.3d 1130, 1134 (10th Cir. 1993); In re Amarex, Inc., 853 F.2d 1526, 1530 (10th Cir. 1988); In

---

[6] Section 503(b)(1)(A) states:

> After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including-
>
> (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case.

re HNRC Dissolution Co., 343 B.R. 839, 843 (Bankr. E.D. Ky. 2006); In re Patient Educ. Media, Inc., 221 B.R. 97, 101 (Bankr. S.D.N.Y. 1998); In re Chateaugay Corp., 102 B.R. 335, 353 (Bankr. S.D.N.Y. 1989). The claimant must demonstrate that (1) the claim arose from a transaction with or on account of consideration furnished to the debtor-in-possession, and (2) the transaction or consideration directly benefited the debtor-in-possession. Mid Region Petroleum, Inc., 1 F.3d at 1133; United Trucking Serv., Inc. v. Trailer Rental Co. (In re United Trucking Serv., Inc.), 851 F.2d 159, 161–62 (6th Cir.1988); Patient Educ. Media, 221 B.R. at 101.

Although this case does not involve a lease, the lease cases illustrate how these rules apply to the possession and use of a non-debtor's property. "If a lessee continues to use premises post-rejection, then a benefit has been conferred upon the estate which constitutes an administrative expense under section 503(b)." In re DVI, Inc., 308 B.R. 703, 708 (Bankr. D. Del. 2004). On the other hand, no administrative claim will arise if the debtor merely possesses the property or has an option to use it but does not actually use it. Patient Educ. Media, 221 B.R. at 102; see Figone v. Spear (In re GFS Creations, Inc.), 240 B.R. 43, 46–47 (N.D. Cal. 1999) (owner of storage property entitled to reasonable rental value, but only for portion of property actually used by the estate); In re Templeton, 154 B.R. 930, 934 (Bankr. W.D. Tex. 1993) (claim denied when property at issue was "not used by the Debtor in any way"); In re Carmichael, 109 B.R. 849, 851 (Bankr. N.D. Ill. 1990) (administrative expenses disallowed when there was no benefit to the estate); In re Cardinal Exp. Corp., 30 B.R. 682, 684 (Bankr. E.D.N.Y. 1983) ("Occupancy by the trustee of the premises from which the debtor was operating gives rise to administrative liability only to the extent and for the period that the trustee actually uses and occupies the premises.").

14

The fact that the debtor has deprived the non-debtor of its property does not automatically trigger an administrative claim. The pertinent inquiry is the actual benefit to the estate, not the loss sustained by the creditor. In re Enron Corp., 279 B.R. 79, 85 (Bankr. S.D.N.Y. 2002); see In re Woodstock Assocs. I, Inc., 120 B.R. 436, 451 (Bankr. N.D. Ill. 1990) ("The bankruptcy courts have broad discretion in determining whether to award administrative expense priority. That discretion is limited by the clear intent of section 503(b)(1)(A): the actual and necessary costs of preserving the estate."). Furthermore, "[t]he mere potential for benefit to the estate does not satisfy the requirement of § 503(b)(1) that the estate receive an actual benefit." In re Mainstream Access, Inc., 134 B.R. 743, 749–50 (Bankr. S.D.N.Y. 1991).

Once the claimant establishes that the estate actually benefited from the use of its property, the court may estimate the amount of the benefit. In re JAS Enterprises, 180 B.R. 210, 217 (Bankr. D. Neb. 1995); Carmichael, 109 B.R. at 851. If the estate only used a portion of the property, the estate must pay an administrative expense only for the portion it used. In re Dant & Russell, Inc., 853 F.2d 700, 707 (9th Cir. 1988); In re Thompson, 788 F.2d 560, 562 (9th Cir. 1986); Patient Educ. Media, 221 B.R. at 102. The contract rate is presumed to set the reasonable value, but either party may offer evidence to prove a different reasonable value. Dant & Russell, Inc., 853 F.2d at 707; Thompson, 788 F.2d at 563. In the absence of a lease or rental agreement, there is no presumptively reasonable rental rate. In re Aerospace Techs., Inc., 199 B.R. 331, 340 (Bankr M.D.N.C. 1996).

Griffin's testimony established, at most, that the debtor was in possession of the Property from the commencement of the chapter 11 case until its eviction. His testimony regarding the actual use was less specific. It appears that the debtor operated a summer camp in 2004, and also received income of $300,000 in 2004. However, there was no evidence regarding the

15

connection, if any, between the income and the use of the Property. Beyond that, Griffin's testimony indicated that he saw people on the premises at various times during the chapter 11 period, but he could not attest to specific times (other than Sukkoth in 2004) and could not state what portion of the Property the debtor actually used. While Griffin testified that the debtor generally barred him from the Property and prevented him from taking a closer look, Helen-May failed to explain why it couldn't obtain the information through the depositions of the Fiduciary Defendants or the third parties that actually used the Property.

The more serious defect in Helen-May's proof concerned the lack of probative evidence showing the fair rental value of the Property. There was no rental agreement and no presumptively fair rental value.[7] Griffin did not qualify as an expert, and while he was allowed to testify as a lay witness, his valuation testimony was not entitled to any weight. He was unfamiliar with the rental value of comparable properties, and lacked knowledge of the Property's income, expenses, cash flow and occupancy rate during the years that he served as its manager. Thus, even if the evidence showed that the debtor used 100% of the Property 100% of the time, there would still be no basis to estimate the fair rental value.

Accordingly, the Court concludes that Helen-May failed to carry is burden of proving the elements of its administrative claim. This conclusion does not affect the Judgment. The Judgment, which is final, was based on an adequate protection award that was intended to approximate the fair rental value of the Property during the post-petition period. In fact, BFK

---

[7] Helen-May did not argue at trial or in its post-trial submission that the Daily Penalty was presumptively reasonable. In fact, Griffin testified that it was too low, and was selected as an accommodation because the debtor was purchasing the Property. It was "not an offer that we would have made to any other than somebody who had the intent to close on the property." (Tr. at 69.)

argued that Helen-May's use and occupancy claim should be limited to the Judgment; this is essentially the result of this decision.

The Court has considered the parties' remaining arguments and concludes that they lack merit. The foregoing constitutes the Court's findings and conclusions.

Settle order on notice.

Dated: New York, New York
September 21, 2010

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge